Lavonne WHITE, Individually; and D.R.W., a Minor, by Lavonne White Mother, Natural Guardian and Best Friend, Appellants

v.

NORTON HEALTHCARE, INC.; Kosair Childrens Hospital; Dr. Wayne Rice; Dr. Alfonso Nichols; Elizabeth A. Hattab, RN.; Charlotte Abrams, RN; and Dr. Jennifer Le, Appellees.

No. 2013–CA–000023–MR.

Court of Appeals of Kentucky.

June 13, 2014.

John F. Stewart, Crestwood, KY, for Appellant.

Sara Collins, Susan D. Phillips, Beth H. McMasters, M. Jude Wolford, Patricia C. LeMeur, Tera M. Rehmel, James P. Grohmann, Louisville, KY, for Appellees.

Before JONES, LAMBERT, and STUMBO, Judges.

*OPINION*

JONES, Judge:

Appellant Lavonne White, in her individual capacity and as guardian and best friend for her minor daughter, D.R.W. White (Daughter), asks us to review the Jefferson Circuit Court's order granting summary judgment in favor of Appellees Norton Healthcare, Inc. (Norton), Kosair Children's Hospital (Kosair), Dr. Wayne Rice, Dr. Alfonso Nichols, Elizabeth A. Hattab, RN., Charlotte Abrams, RN., and Dr. Jennifer Le. For the reasons set forth below, we affirm.

### I. FACTS AND PROCEDURAL BACKGROUND

On the evening of Saturday, December 19, 2009, White took Daughter to Kosair's emergency room (ER) for treatment. White told ER personnel that Daughter was "out of control."

Psychiatric Triage Nurse Elizabeth Hattab performed an initial psychiatric nursing evaluation of Daughter, at which time Daughter reported that White "hits her with a belt and today pushed her and scratched her arm." Nurse Hattab noted that a scratch was "evident" on Daughter's upper right arm. Nurse Hattab then interviewed White. White confirmed that she had physically disciplined Daughter with a belt, and further reported that Daughter only responds to physical force, and that "[m]y child seeks pain." Additionally, White reported that Daughter may have been sexually abused by the son of a friend and White indicated that she suspected a history of mental illness in the family.

Based on her initial examination and interviews, Nurse Hattab suspected that Daughter may have been abused. As a result, she completed a suspected abuse/neglect reporting form and contacted Child Protective Services (CPS). Her records indicate that she called CPS at 8:20 p.m. that evening and was told by CPS personnel that the on-call caseworker was unavailable, but would return her call. Before she left for the evening, Nurse Hattab noted in the triage form that a return call from CPS was expected, but had not yet been received.

Dr. Wayne Rice, an ER physician, also examined Daughter while she was in the ER. Dr. Rice's notes indicate that Daughter reported that White hit her with a belt, and White confirmed this happened regularly. On examination, Dr. Rice noted linear abrasions on Daughter's upper left arm, the back of her left thigh, and mid back. As part of his examination, Dr. Rice photographed the areas he believed indicated possible abuse. Dr. Rice noted that a nurse had contacted CPS, but CPS had not yet contacted Kosair.

Nurse Hattab and Dr. Rice concurred that the best course of action would be to admit Daughter to 6C, the Ackerly (psychiatric) Unit for further observation. Daughter was admitted to the Ackerly Unit by Dr. Shelby, the on-call physician, at 11:00 p.m. that evening.[1]

The following morning, Sunday, December 20, 2009, White approached Nurse Charlotte Abrams in the Ackerly Unit and requested to take Daughter home. Nurse Abrams contacted Dr. Alfonso Nichols, the Medical Director of the Ackerly Unit. Nurse Abrams informed Dr. Nichols that Daughter had been admitted the previous evening after White brought her to the ER and emergency personnel suspected that Daughter had been abused by White. Nurse Abrams further informed Dr. Nichols that CPS had been contacted, but not yet responded. Based on this information, Dr. Nichols, by telephone, ordered that a 72–hour hold be placed on Daughter; Nurse Abrams then completed an involuntary custody form hold. When hospital personnel refused to release Daughter over to White, she became upset and had to be escorted out of the hospital.

Later that day, Dr. Jennifer Le, the child psychologist on duty, interviewed Daughter for approximately two hours and conducted a physical examination. According to Dr. Le's notes, Daughter reported that both of her parents hit her with the non-buckle end of a belt, up to three times per week and hit her on the legs, buttocks, and lower and upper back. Dr. Le's physical examination revealed abrasions and scars on Daughter's arms, legs, and upper body. Dr. Le discussed her findings with White who admitted striking Daughter with a belt. Dr. Le completed another suspected abuse/neglect reporting form and faxed it to CPS that evening.

The following day, Monday, December 21, 2009, a CPS case worker interviewed Daughter. The CPS worker discharged Daughter to be released to her parents. White, however, unwilling to wait for Daughter to be medically discharged, signed Daughter out against medical advice (AMA). The following day, Dr. Le filed another suspected abuse/neglect reporting form because White had removed Daughter from the hospital AMA.

On December 20, 2010, White, individually and on behalf of Daughter, filed a complaint in Jefferson Circuit Court against Drs. Rice, Le, and Nichols; Nurses Hattab and Abrams; Kosair; and Norton alleging medical negligence and violation of KRS[2] 620.030, the statute that governs reporting suspected child abuse.

On September 28, 2011, the trial court entered an order granting each of the defendants named in White's complaint summary judgment. The trial court reasoned that White had not satisfied her burden of proof of any alleged medical negligence, and that there was no evidence that any of the named defendants acted in bad faith. The trial court's order states:

> [I]t is impossible to conclude that any of the Defendants acted in bad faith individually or in concert, with respect to examining [Daughter], reporting suspected abuse to CPS, placing the involuntary hold on [Daughter] or discharging her. At the hearing, when asked to identify bad faith by Defendants, Plaintiff's counsel read various portions of the Complaint. He point out Ms. White's inability to leave with [Daughter] whenever she wanted; Dr. Le's conducting a physical examination of [Daughter] with-

---

1.  Dr. Shelby is not a party to this action.

2.  Kentucky Revised Statute.

out Ms. White's consent; Dr. Le's photographing injury sites consistent with suspected abuse; Dr. Le's accessing [Daughter's] medical records after her discharge; and the failure to inform Ms. White of her rights under KRS 645.030(1) as examples of bad faith violation of the statute. However, contrary to the Plaintiffs' argument otherwise, these allegations, in and of themselves, do not tend to show bad faith. The Plaintiffs are unable to explain how these actions indicate what the real motivation was other than taking steps to protect a child whose parent brought her to the emergency room for behavioral issues that may be related to abuse at home. Indeed, under the Plaintiff's interpretation of the statutes, a health care provider must ask the person suspected of abuse for permission to conduct an examination that could uncover evidence that person is abusing the child. This is a conclusion the Court is confident the Legislature did not intend.

White filed a motion to alter, vacate or amend arguing summary judgment was premature and that the named defendants did not comply with the statutory provisions of KRS 620.030–620.050, including the provisions regarding an involuntary hold. The trial court denied White's motion. This appeal followed.

## II. STANDARD OF REVIEW

The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Pearson ex rel. Trent v. Nat'l Feeding Systems, Inc.,* 90 S.W.3d 46, 49 (Ky.2002). "[T]he trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480–82 (Ky.1991).[3]

■ "[T]he decision of whether immunity applies in a given situation involves the determination of material facts; however, the question of immunity is one of law...." *Norton Hospitals, Inc. v. Peyton,* 381 S.W.3d 286, 291 (Ky.2012). Therefore, our review is *de novo.*

## III. ANALYSIS

### A. Immunity

KRS 620.030(1), Kentucky's mandatory child abuse reporting statute, states as follows:

Any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to a local law enforcement agency or the Department of Kentucky State Police; the cabinet or its designated representative; the Commonwealth's attorney or the county attorney; by telephone or otherwise. Any supervisor who receives from an employee a report of suspected dependency, neglect, or abuse shall promptly make a report to the proper authorities for investigation. If the cabinet receives a report of abuse or neglect allegedly committed by a person other than a parent, guardian, or person exercising custodial

---

3. While the Court in *Steelvest* used the word "impossible" in describing the strict standard for summary judgment, the Supreme Court later stated that that word was "used in a practical sense, not in an absolute sense." *Lewis v. B & R Corp.,* 56 S.W.3d 432, 436 (Ky.App.2001) (citing *Perkins v. Hausladen,* 828 S.W.2d 652, 654 (Ky.1992)).

control or supervision, the cabinet shall refer the matter to the Commonwealth's attorney or the county attorney and the local law enforcement agency or the Department of Kentucky State Police. Nothing in this section shall relieve individuals of their obligations to report.

Immunity for both civil and criminal liability is provided to individuals that report under this section, pursuant to KRS 620.050(1), which states:

Anyone acting upon reasonable cause in the making of a report or acting under KRS 620.030 to 620.050 in good faith shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed. Any such participant shall have the same immunity with respect to participation in any judicial proceeding resulting from such report or action. However, any person who knowingly makes a false report and does so with malice shall be guilty of a Class A misdemeanor.

White contends the trial court erred by prematurely granting summary judgment in favor of Appellees. Specifically, White argues that Appellees are not entitled to immunity because Daughter was not in any "imminent danger" and their actions, including the placing of the 72–hour hold on Daughter, were in bad faith because they exceeded the authority granted to them under KRS 620.030.

Recently, Kentucky's highest court addressed KRS 620.030 and the statutory immunity conferred in KRS 620.050(1) by the General Assembly in *Norton Hospitals Inc. v. Peyton*, 381 S.W.3d 286 (Ky.2012). In *Peyton*, the Court stated:

KRS 620.050(1) clearly states that a reporter (of dependency, neglect, or abuse) has immunity in either of two situations: where the reporter is acting upon *reasonable cause*, or where the reporter is acting *in good faith* under KRS 620.030 to 620.050. The second situation in which a reporter is granted immunity (acting in good faith under KRS 620.030 to 620.050) incorporates by reference the knowledge or reasonable cause requirement of KRS 620.030(1), but it also grants immunity where there is a *good faith belief that* the reporter knows, or a *good faith belief that* the reporter has reasonable cause to believe that a child is dependent, neglected, or abused. Any other interpretation of the sentence would nullify the immunity granted by acting "in good faith" and render the second part of the sentence redundant. Clearly, the General Assembly did not intend on granting immunity only to take it away because that would lead to an absurdity and any interpretation that leads to an absurdity must be rejected. Also, another rule of statutory interpretation requires that we attempt to harmonize all the provisions of a statute which (when applied to this statute) means that the added language was meant to add something different than simply restating the first part of the sentence.

The Court went on to emphasize:

Our interpretation is also consistent with prior interpretations of "acting in good faith." Kentucky cases have found actors to be "acting in good faith" when the evidence established that they *believed* they were discharging a duty the law imposed upon them. *Roberts v. Hackney*, 109 Ky. 265, 59 S.W. 328 (1900); *Richardson v. Lawhon*, 4 Ky. L.Rptr. 998 (Ky.Super.Ct.1883). Thus, a "good faith belief" is a determination of the state of mind of the actor. *Star Bank, Kenton County, Inc. v. Parnell*, 992 S.W.2d 189 (Ky.App.1998).

That is to say, a reporter may be "acting under KRS 620.030 to 620.050 in good faith" if the reporter subjectively *be-*

*lieved* he or she was discharging the duty imposed by KRS 620.030. Therefore, a reporter's good faith belief that he or she is discharging the lawful duty to report under KRS 620.030, even if such a belief is ultimately determined to be erroneous, is all that is required under KRS 620.050(1).

*Id.* at 292–93.

■ Applying the facts of this case, to the standard outlined in *Peyton,* we find no evidence to support White's contention that Appellees acted in "bad faith." Here, White presented to Kosair with Daughter because of behavioral issues. Upon being evaluated, Daughter reported that White had hit her with a belt, up to three times a week, had pushed her, and scratched her arm. Documentation of a scratch on Daughter's right arm was made, along with documentation of abrasions and scars over Daughter's arms, legs, and upper body. Additionally, White confirmed Daughter's reports to both Dr. Le and Nurse Hattab. Based on these undisputed facts, we believe there was sufficient evidence to support Appellees' subjective belief of possible abuse entitling them to immunity pursuant to KRS 620.050(1).

White also argues that KRS 620.040(5)(d) requires written notice stating the reasons for removal of the child. White concedes, however, "[f]ailure of the parent or other person to receive notice shall not, by itself, be cause for civil or criminal liability." KRS 620.040(5)(d). Therefore, White has no claim for any alleged violation of KRS 620.040(5)(d).

■ White further cites to *Garrison v. Leahy–Auer,* 220 S.W.3d 693 (Ky.App. 2006), arguing that it was impermissible for the Appellees to photograph and perform other medical diagnostics on Daughter because no request had been made by the CPS for any such documentation.

KRS 620.050(14) governs the making of photographs and use of medical diagnostics in connection with child abuse reports. It provides:

As a result of any report of suspected child abuse or neglect, photographs and X-rays or other appropriate medical diagnostic procedures may be taken or caused to be taken, without the consent of the parent or other person exercising custodial control or supervision of the child, as a part of the medical evaluation or investigation of these reports. These photographs and X-rays or results of other medical diagnostic procedures may be introduced into evidence in any subsequent judicial proceedings. The person performing the diagnostic procedures or taking photographs or X-rays shall be immune from criminal or civil liability for having performed the act. Nothing herein shall limit liability for negligence.

Thus, KRS 620.050(14) "provides an exception to immunity if the person acted negligently in performing medical diagnostic procedures at the request of the Cabinet based upon a report of abuse." *Leahy–Auer,* 220 S.W.3d at 700. We find the exception provided in KRS 620.050(14) for negligence claims to be inapplicable in the present case. We believe the negligence exception is intended to apply only where the diagnostics are administered negligently in some way so as to cause injury to the patient, *i.e.* the provider administered or performed the diagnostics in a manner that deviated from the standard of skill expected of a reasonably competent medical practitioner. We do not believe that the statute intended to exempt immunity where the only allegation relates to the decision to perform the diagnostics. In this case, White's complaint alleges only that the diagnostics should not have been performed; she does not allege that the

diagnostics were administered negligently. Therefore, we do not believe the negligence exception of KRS 620.050(14) applies to White's claims.

■ Finally, we consider White's argument that the trial court prematurely granted summary judgment. Generally, a court should not grant summary judgment without affording the opposing party the opportunity to engage in sufficient discovery. There is an exception in our case law, however, when dealing with immunity defenses. Under Kentucky law, statutory immunity is designed to relieve a defendant from the burdens of litigation, thus a defendant should be able to invoke immunity at the earliest stage of a proceeding. *Rowan County v. Sloas,* 201 S.W.3d 469, 474 (Ky.2006). If the record contains sufficient facts, "a motion for summary judgment is generally an appropriate method for the trial court to determine whether immunity applies." *Peyton,* 381 S.W.3d at 291. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03

Having reviewed White's complaint, we fail to appreciate how additional discovery would have produced material evidence related to the immunity issue. The record contained affidavits from the medical personnel as well as copies of Daughter's admission and medical records. The record contained the evidence the trial court needed to determine whether Appellees were statutorily immune from suit. We find no error in this regard.

### B. Medical Negligence

■ "The burden of proof in a malpractice case is, of course, on the party charging negligence or wrong. That must be established by medical or expert testimony unless the negligence and injurious results are so apparent that laymen with a general knowledge would have no difficulty in recognizing it." *Johnson v. Vaughn,* 370 S.W.2d 591, 596 (Ky.1963). Additionally, in Kentucky, a plaintiff who alleges "medical malpractice is generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care." *Blankenship v. Collier,* 302 S.W.3d 665, 670 (Ky. 2010) (citing *Perkins v. Hausladen,* 828 S.W.2d 652, 655–56 (Ky.1992)).

■ During oral arguments on the summary judgment motions, the trial court stated that White had failed to include any expert opinion substantiating her allegations that Appellees deviated from the applicable standard of care with respect to Daughter's treatment. The trial court ordered White to file an expert opinion within forty-five days and indicated that her failure to do so would be fatal to her medical negligence claim.

Thereafter, White filed an affidavit from Jan Powe, the Federal Program Coordinator at Kentucky Protection & Advocacy. Her affidavit states as follows:

I, Jan Powe, being duly sworn state the following: I am employed at Protection & Advocacy, a state agency of Commonwealth of Kentucky. P & A is located at 100 Fair Oaks Ln., Suite 302, Frankfort, KY 40601. Under federal law, P & A has been designated as the agency in the Commonwealth of Kentucky to protect the rights of individuals with disabilities, advocate for the rights of individuals with disabilities, and education on disability rights. My title is Federal Program Coordinator. I have worked at P & A for nineteen (19) years. I coordinate three (3) federal programs at P &

A. The programs are Protection and Advocacy of Individual Rights, and Protection and Advocacy for Beneficiaries of Social Security. I spend the majority of my time with Protection and Advocacy for Individuals with Mental Illness. My job duties consist of proving legally based advocacy for individuals with disabilities. I maintain an active caseload of individuals with mental illness, monitor systems, monitor and investigate abuse and neglect in institutions and programs that receive federal funding, review legal requirements, state and federal, and provided technical assistance. I work with all ages, children and adults. Children under the age of sixteen (16) can be voluntarily hospitalized for mental health purposes by the parent(s) or legal guardian. Children sixteen and over can be involuntarily hospitalized for mental health reasons by filing a certified petition by parent(s), legal guardian, a hospital or an interested party/ A child under the age of sixteen (16) who has been voluntarily hospitalized for mental health reasons by a parent may be voluntarily removed by the parent(s). A hospital has the recourse of requiring parent(s) to sign a form Against Medical Advice (AMA) or file a petition when a parent(s) who voluntarily placed their child in the hospital for mental health purposes seeks to voluntarily remove the child from the hospital.

Powe is not a doctor. Her affidavit says nothing about the standard of care or indicates that she has reviewed the facts of this case and believes that defendants violated the standard of care.

In *Andrew v. Begley,* 203 S.W.3d 165, 170–71 (Ky.App.2006), we explained the necessity of placing competent expert *medical* testimony in the record:

The presumption of negligence "is never indulged in from the mere evidence of mental pain and suffering of the patient, or from failure to cure, or poor or bad results.... The burden of proof is upon the patient to prove the negligence of the physician or surgeon, and that such negligence was the proximate cause of his injury and damages." *Meador v. Arnold,* 264 Ky. 378, 94 S.W.2d 626, 631 (Ky.1936). In proving negligence, an injured person may present lay testimony to establish his or her appearance after treatment or testify regarding existing pain or its severity. *See id.*

Except in limited factual circumstances, however, the plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury. *See id.; Johnson v. Vaughn,* 370 S.W.2d 591, 596–97 (Ky. 1963); and *Reams v. Stutler,* 642 S.W.2d 586, 588 (Ky.1982).

The opinion of the expert must be based "on reasonable medical probability and not speculation or possibility." *Sakler v. Anesthesiology Associates, P.S.C.,* 50 S.W.3d 210, 213 (Ky.App.2001). To survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper. *See Turner v. Reynolds,* 559 S.W.2d 740, 741–42 (Ky. App.1977).

Kentucky consistently recognizes two exceptions to the expert witness rule in medical malpractices cases. *See Perkins v. Hausladen,* 828 S.W.2d 652, 655 (Ky.1992). Both exceptions involve the application of the *res ipsa loquitur* doctrine and permit the inference of negligence even in the absence of expert testimony. *See id.* at 654. One excep-

tion involves a situation in which " 'any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care'; illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy. The second occurs when 'medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters.'" *Id.* at 655 (quoting Prosser and Keeton on Torts, Sec. 39 (5th ed.1984)). An example of the second exception would be the case in which the defendant doctor makes admissions of a technical character from which one could infer that he or she acted negligently. *See id.*

Here, we do not believe that Powe's affidavit establishes the applicable medical standard of care. Furthermore, there are no facts or circumstances from which negligence and causation can be inferred. Likewise, we do not believe that the average layperson possesses the knowledge or experience to opine on the admission of a child for suspected child abuse against her parent's or guardian's will and the treatment and diagnostics that are called for in such a situation.

In short, White was required to present expert *medical* testimony on the issue of medical negligence. Like the trial court, we find Powe's affidavit insufficient to amount to expert testimony. A review of Powe's affidavit reveals nothing more than a mere recitation of the law. Nothing in Powe's affidavit provides any opinion of how the Appellees deviated from the applicable medical standard of care for negligence purposes. Therefore, we agree with the trial court that summary judgment was proper.

## IV. CONCLUSION

Therefore, for the forgoing reasons, we affirm the order of the Jefferson Circuit Court.

ALL CONCUR.

